UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MATTHEW DOOHAN,

                         Plaintiff,

       -against-

SUFFOLK COUNTY,

                         Defendant,
-----------------------------------------------------------------X

Docket No.: 22-CV-7088

**COMPLAINT**

Jury Trial Demanded

    Plaintiff, MATTHEW DOOHAN, by and through his attorneys, RICOTTA & MARKS, P.C., allege upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

**JURISDICTION AND VENUE**

1. This action is brought pursuant to 42 U.S.C. § 1983, to redress a violation of Plaintiff's constitutional rights in the terms, conditions and privileges of employment of Plaintiff by the Defendant, as well as deprivation by the Defendant, acting under color of law, of the policies, ordinances, custom and usage of rights, privileges and immunities secured to the Plaintiff by the Fourteenth Amendment to the Constitution of the United States and all the laws and statutes thereunder, and any other cause of action which can be inferred from the facts set forth herein.

2. The jurisdiction of this Court is invoked under 28 U.S.C. § 1331, the doctrine of pendant jurisdiction and aforementioned statutory provisions.

3. Venue is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

4. Plaintiff, Matthew Doohan ("Doohan"), was and still is a resident of Suffolk County, State of New York.

5. Defendant, The County of Suffolk ("the County"), was and still is a County located in New York, New York. Suffolk County Police Department ("Police Department") is an administrative arm of the County.

## FACTS

6. In or around September 2015, Doohan was hired by the Police Department as a police officer.

7. During the course of his employment with the County, Doohan performed his job in a satisfactory manner and was qualified for his position, as evidenced by his receipt of numerous letters of appreciation for the work he performed.

8. On or about late November 2019, Doohan was diagnosed with depression and anxiety, including PTSD, as a byproduct of his coworker, tragically, committing suicide. Notwithstanding the grief and mental health issues Doohan was dealing with, he was able to, and did, continue to perform his job in a satisfactory manner.

9. In January 2020, Doohan was involved in an off-duty incident when he discovered that his then girlfriend was having an affair with another County police officer. While there was a verbal altercation, and police were eventually called, the incident was documented as a verbal dispute and no arrests or citations were issued. Neither of Doohan's weapons were on his person the night of that incident, as they were both at his home. This was confirmed

by the responding officers that night, and the weapons were ultimately retrieved later that evening by the Department at Doohan's residence.

10. That evening, due to the issues he had been dealing with, as well as this new development and betrayal, Doohan requested of the Department to transport him to Mather University Hospital for treatment. Doohan, at that time, explained that he was suffering from mental health issues, including depression and anxiety, and needed help for the issues he was having. The Department was reluctant, but ultimately accommodated his request, and a union vehicle drove and dropped him off at the Hospital.

11. Doohan was at Mather University for approximately six hours, and he was released under the care of a mental health professional.

12. That night, the responding officer on scene documented everything that it was all verbal and there was no violence during this incident.

13. Nonetheless, four days after this January 2020 incident, due to Doohan's medical history and disability, his now ex-girlfriend, with the assistance of police personnel, created a fictional narrative of the events from four days prior, claiming Doohan had been physically violent, and highlighting Doohan's mental health issues and disability, in an effort to have him face negative consequences at his job, based on his disability. This change in narrative was less than twenty-four hours after Doohan had sent her a letter ending the relationship.

14. As a result of this report, as well as Doohan's statements the night of the incident, the Police Department became aware of Doohan's disability and treatment for same.

15. The ex-girlfriend also had an order of protection entered against Doohan, which was ultimately dismissed.

16. Doohan was out of work, due to his receiving medical treatment, using his own sick time until approximately June 2020.

17. On or about January 31, 2020, Doohan was scheduled for his first "fitness for duty" test to return to work. As a result of this evaluation, the police surgeon recommended that Doohan remain out of work while treating his disability further.

18. On or about March 27, 2020, Doohan was scheduled for a second fitness for duty test for April 13, 2020. At that time, Doohan was evaluated.

19. On or about June 2, 2020, Doohan was informed, for the first time, that, as a result of that April 13, 2020 evaluation, he had been deemed fit to return to work at full duty status, with a return of his firearms and no limitations. Despite this determination, the Police Department, not wanting Doohan to return to work given his PTSD diagnosis, delayed in advising Doohan of this determination. This delay prevented him from returning to work sooner, and impacted his income, and forced him to use further sick time.

20. On or about June 7, 2020, Doohan returned to work at the 4th Precinct front desk. Upon his return to work, Doohan, at the direction of his union, submitted a letter requesting that he receive his sick days back that were used during the time he was involuntarily suspended.

21. Despite his being cleared for fully duty, Doohan was placed on desk duty, despite him previously being assigned to patrol and his being cleared to return to patrol. This cost Doohan significant overtime opportunities and advancement opportunities, having been assigned to "desk duty."

22. Two weeks later, Doohan was suspended, again, for the incident that had occurred in January 2020. Again, this was despite the fact that, at that time, no charges or citations were issued for what amounted to a verbal dispute.

23. In or about early July 2020, the Commanding Officer of the 4th Precinct, Inspector Michael Romagnoli, informed Doohan that he was required to appear at yet another Fitness for Duty test on July 20, 2020. Similarly situated officers who did not suffer from disabilities were not required to needlessly complete repeated fitness for duty examinations.

24. On or about July 17, 2020, the Union contacted Doohan and informed him that his upcoming Fitness for Duty test was cancelled.

25. On or about July 20, 2020, the Police Department sent Doohan a letter suspending him, claiming that it was due to the January 2020 incident. He was advised that this would be a suspension with pay, and they would be "offering a deal."

26. Shortly thereafter, the Department "offered" that if Doohan resigned, they would give him "good guy" letters and he would face no consequences, but he would also have to not speak of this or pursue any claims. Doohan declined and was told he would then be suspended pending arbitration.

27. While Doohan was suspended, he was again contacted September 18, 2020 by the County and was asked if he would reconsider taking the deal. When he declined, they converted his suspension to without pay.

28. In or around October 2020, an arbitration hearing occurred.

29. In January 2021, Doohan deployed with the United States Army.

30. In or around May 2021, a new arbitrator who had not presided over the case, terminated Doohan his employment with the County under false pretenses, including the false claim of a physical altercation occurring and/or a known lie that his weapon was in his car when he had a verbal altercation at his ex-girlfriend's house. It was not, the County knew is was not, but advanced the knowingly false argument that it was in order to effectuate Doohan's

termination due to his disability.  In short, upon learning of Doohan's mental health issues, the County did all they could to create a basis by which they could terminate Doohan, despite him being otherwise fit to perform his duties.

31. Of note, this was also done to Doohan while he was deployed, as a member of the U.S. Army, and as such, he did not have the ability to truly fight this discriminatory action by the County and the false basis for the termination decision, as he was overseas serving our country.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER FEDERAL LAW

32. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

33. Defendant, while acting under color of federal law, deprived Plaintiff of his constitutional rights, as secured by the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983.  The Defendant has intentionally committed, condoned or was deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights in that the Defendant's custom or practice of discriminating and/or retaliating against Plaintiff due to Plaintiff's sex to perpetuate, without abatement, in violation of Plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiff demands judgment against Defendant, where applicable, for all compensatory, emotional, and physical damages, lost pay, front pay, injunctive relief, and any other damages permitted by law.  Plaintiff demands a trial by jury.

Dated: Long Island City, New York
November 21, 2022

                                                Respectfully submitted,

RICOTTA & MARKS, P.C.
*Attorneys for Plaintiff*
24-11 41st Avenue, Second Floor
Long Island City, New York 11101
(347) 464-8694

_____/s_____
Matthew Marks